## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **A.F. of L. – A.G.C. BUILDINGS TRADE WELFARE PLAN on behalf of itself and all others similarly situated,** | : <br> : <br> : <br> : <br> : |
| **Plaintiff,** | :    **Civil Action No.** |
| | :    _____ |
| **v.** | : |
| | : |
| **BOEHRINGER INGELHEIM PHARMA GmbH & CO. KG; BOEHRINGER INGELHEIM INTERNATIONAL GmbH; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; BARR PHARMACEUTICALS, INC.; DURAMED PHARMACEUTICALS, INC.; and DURAMED PHARMACEUTICALS SALES CORP.,** | :    **CLASS ACTION** <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> :    **JURY TRIAL DEMANDED** <br> : |
| **Defendants.** | : <br> : |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff A.F. of L. – A.G.C. Buildings Trade Welfare Plan ("Plaintiff"), individually and on behalf of itself and all others similarly situated, brings this class action against Defendants Boehringer Ingelheim Pharma GmbH & Co. KG ("BIPGKG"), Boehringer Ingelheim International GmbH ("BII"), Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") (collectively "Boehringer"), Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Limited (collectively "Teva"), Barr Pharmaceuticals Inc. ("Barr"), Duramed Pharmaceuticals Inc. ("Duramed"), and Duramed Pharmaceuticals Sales Corp. ("DPSC") (collectively "Defendants").

The following allegations are based upon the investigation of counsel and information and belief.

## I.     NATURE OF THEACTION

1.      This is a federal and state civil antitrust class action seeking treble damages and other relief arising out of Defendants' anticompetitive scheme to unlawfully exclude generic competition from the market for Aggrenox, a brand name prescription pharmaceutical sold by Boehringer.  Boehringer had U.S. sales of Aggrenox of $366 million in 2008, and $404 million 2009.

2.      Aggrenox is a combination antiplatelet agent used to reduce the risk of stroke in patients who have already suffered a "mini-stroke" (or transient ischemic attack) or a completed ischemic stroke due to thrombosis (i.e., blood clot).  Each Aggrenox hard gelatin capsule contains 200 mg dipyridamole in an extended-release form and 25 mg acetylsalicylic acid (aspirin) capsules, as an immediate-release sugar-coated tablet.  Boehringer received approval to manufacture, market and sell Aggrenox in the United States from the United States Food and Drug Administration ("FDA") in 1999.  Boehringer has been able to charge and earn monopoly prices and profits for Aggrenox since 1999.

3.      Boehringer's monopoly profits would cease once one or more lower-priced generic versions of Aggrenox entered the market, as purchasers rapidly switch from a brand version to the generic version.  Plaintiff and the Class were deprived the benefits of generic competition and suffered significant overcharges by Defendants' unlawful conduct.

4.      Barr sought FDA approval to launch a generic version of Aggrenox on or about May 31, 2007.  Boehringer immediately initiated a patent infringement suit against Barr to protect its monopoly profits, alleging that Barr infringed Boehringer's U.S. Patent No.

6,015,577 ("the '577 patent").   Boehringer's patent infringement suit triggered a statutory automatic stay of the FDA's approval of Barr's generic product.

5.      Barr's challenge to the '577 patent would have enabled Barr to introduce its lower-priced generic Aggrenox product, and also would have allowed other generic manufacturers potentially to enter the market, creating greater competition resulting in lower prices.

6.      Recognizing the serious threat of its '577 patent being invalidated, Boehringer formulated an anticompetitive scheme to pay Barr significant sums of money to abandon its challenge to the '577 patent and forego selling its generic version of Aggrenox for a period of seven (7) years.

7.      Boehringer effectuated this scheme beginning in August 2008 when it entered into a reverse payment settlement with Barr ("Reverse Payment Agreement").   Pursuant to the settlement, Barr agreed to abandon its challenge to the '577 patent, and not market its generic version of Aggrenox before July 1, 2015.   The '577 patent was set to expire in January 2017. The Reverse Payment Agreement secured approximately 82% of the patent's life, thereby protecting Boehringer's monopoly.   In return, Boehringer entered into a "co-promotion deal" with Barr designed to compensate Barr for agreeing not to enter the market for seven years. Under the deal, Barr's subsidiary, Duramed, would promote Aggrenox to obstetricians and gynecologists during this seven-year period.   Under the "co-promotion deal" Barr would receive approximately $120 million over the seven years (based on Aggrenox's 2008 sales levels). Notably, the deal's structure included an immediate payment upfront and continuing payments each year calculated as a percentage of Aggrenox United States sales.   The "co-promotion deal" is highly suspect, as there is little to no benefit to Boehringer from Barr promoting Aggrenox, a stroke drug, to a group of mostly obstetricians and gynecologists.   On August 14, 2008, the

court in the patent infringement suit dismissed the patent infringement case that was pending between Barr and Boehringer regarding Aggrenox.  Since the Reverse Payment Agreement's execution in August 2008, Barr continues to delay marketing its generic version of Aggrenox and Boehringer continues to make payments to Barr/Teva pursuant to "co-promotion deal."

8.      It is patently clear that the "co-promotion deal" was tied to the Reverse Payment Agreement for four reasons.  *First*, a federal court, petitioned to enforce an FTC subpoena, found that the "co-promotion deal" was an "integral" part of the settlement.  *Second*, in court hearings related to the Federal Trade Commission's ("FTC") investigation of the Reverse Payment Agreement, Boehringer admitted that millions of dollars in payments made pursuant to the "co-promotion deal" were tied to the Reverse Payment Agreement.  *Third*, Boehringer has stated that the "co-promotion deal" was "inextricably intertwined" with the settlement, and that Boehringer would not have been willing to give Barr the immediate and continuing payments under the "co-promotion deal" while the parties were in contentious litigation.  In other words, Barr's ability to obtain the valuable $120 million promotion deal was contingent on agreeing to settlement terms (and an entry date) that were acceptable to Boehringer.  *Fourth*, Boehringer has admitted that the "co-promotion deal" "informed" the Reverse Payment Agreement terms and was "part of the flow of compensation" and "part of the consideration" that Boehringer paid to Barr for agreeing to the settlement.

9.      To Barr, delaying entry of its generic Aggrenox made perfect economic sense. The economic benefit of the "co-promotion deal," as much as $120 million over seven years, versus entering the highly competitive market was straightforward.  Barr would have faced generic competition from an authorized generic of Aggrenox, and eventually from other generics that would have driven the price for generic Aggrenox sharply lower.  Thus, the division of monopoly profits between Boehringer and Barr was mutually beneficial, as free and

unrestrained competition resulting in lower prices to consumers was foreclosed for a significant period of time.

10.     As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiff and members of the Class have been injured in their business or property.  Their injury consists of paying higher prices for Aggrenox than they would have paid in the absence of such violations.  This injury is of the type the antitrust and consumer protection laws of the States, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendant's conduct unlawful.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

12.     This Court also has jurisdiction over this matter pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 in that Plaintiff brings claims under § 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy Defendants' violations of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.  The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is appropriate within this district under § 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), because Defendant Boehringer maintains its U.S. headquarters in this district, transacts business within this District, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this district.

### III.    PARTIES

14.     Plaintiff A.F. of L. - A.G.C. Building Trades Welfare Plan (the "AFL Plan") is a welfare benefit plan with its principal place of business in Mobile, Alabama.  The AFL Plan represents participants who have family coverage and purchased, paid or provided reimbursement for Aggrenox.  During the Class Period, the AFL Plan and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein.  The AFL Plan sustained injury when it purchased, paid and/or provided reimbursement for Aggrenox purchases.

15.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG ("BIPGKG") is a limited partnership organized and existing under the laws of Germany, with its principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

16.     Defendant Boehringer Ingelheim International GmbH ("BII") is a private limited liability company organized and existing under the laws of Germany, with its principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

17.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877.

18.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation, with its principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania 19454.

19.     Defendant Teva Pharmaceutical Industries, Ltd., is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva, Israel.  Teva is a leading manufacturer of generic drugs, and it is one of the

largest sellers of generic drugs in the United States.  Teva purchased Barr in 2008, and Barr is now a wholly-owned subsidiary of Teva.

20.     Defendant Barr is a corporation organized under the laws of the State of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Before 2004, Barr was known as Barr Laboratories, Inc.  In 2008, Barr became a wholly-owned subsidiary of Teva.

21.     Defendant Duramed is a corporation organized under the laws of the State of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, Duramed was a subsidiary of Barr.  Upon Teva's purchase of Barr in 2008, Duramed became a subsidiary of Teva.  Duramed is now known as Teva Women's Health Inc.

22.     Defendant DPSC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, DPSC was a subsidiary of Barr.  In 2008, when Teva purchased Barr, DPSC became a subsidiary of Teva.

23.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful anticompetitive scheme and illegal restraints of trade alleged herein, and were authorized, ordered, and/or performed by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs, within the course and scope of their duties and employment, and/or with the actual or apparent authority of Defendants.

## IV.     CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on behalf of itself and, under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, as representative of a Class defined as follows:

All persons or entities in the United States and its territories who indirectly purchased, paid or provided reimbursement for some or all of the purchase price of Aggrenox in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period August 2009, through the present and continuing until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").  For purposes of the Class definition, persons or entities "purchased" Aggrenox if they paid or reimbursed some or all of the purchase price.

The following persons or entities are excluded from the proposed Class:

a. Defendants and their respective subsidiaries and affiliates;

b. All governmental entities (except for government funded employee benefit plans);

c. All persons or entities who purchased Aggrenox for purposes of resale or directly from a Defendant to the extent and solely to the extent of such purpose for resale or as a direct purchase;

d. Insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug purchases;

e. Fully insured health plans (i.e., plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members); and

f. All judges presiding in this case and all counsel of record.

25.     Members of the Class are so numerous that joinder is impracticable.  Plaintiff conservatively believes that the Class numbers in the hundreds of thousands.  Further, the Class is readily identifiable from information and records.

26.     Plaintiff's claims are typical of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants (i.e., they have paid artificially inflated prices for 200 mg extended-release dipyridamole/25 mg acetyl salicylic acid (aspirin) capsules and were deprived of the benefits of free and unrestrained competition from less expensive generic versions of Aggrenox as a result of Defendants' wrongful conduct).

27.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are consistent with, and not antagonistic to, those of the Class.

28.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, particularly class action antitrust litigation in the pharmaceutical industry.

29.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable questions are inherent in Defendants' wrongful conduct.

30.     Questions of law and fact common to the Class include:

     a.     whether the agreement between Defendants alleged herein constitutes a violation of the antitrust laws;

     b.     whether Defendants unlawfully maintained monopoly power through the conduct alleged herein;

     c.     whether Defendants unlawfully excluded competition and potential competition from the market for 200 mg extended-release dipyridamole/ 25 mg acetylsalicylic acid (aspirin) capsules;

     d.     whether Defendants unlawfully conspired to delay or prevent generic manufacturers from entering the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules;

     e.     whether Defendants' conduct harmed competition in the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules;

     f.     whether Boehringer possessed market or monopoly power over the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules;

     g.     whether Defendants' conduct substantially affected interstate commerce; and

  h.   whether, and to what extent, Defendants' conduct caused antitrust injury to Plaintiff and Class members, and the amount of overcharge damages to be awarded to the Class.

31.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in management of this class action.

32.   Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.   REGULATORY FRAMEWORK

### A.   NDA Approval and the Hatch-Waxman Act

33.   Under the federal Food, Drug, and Cosmetics Act ("FDC Act"), 21 U.S.C. §§ 301-392, a manufacturer who creates a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA").   An NDA must include submission of specific data concerning the safety and efficacy of the drug, as well as any information on applicable patents.

34.   Upon FDA approval of a brand-name manufacturer's NDA, it is published in the "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly referred to as the "Orange Book").   The Orange Book lists any patents: (1) that the brand-name manufacturer claim the approved drug or its approved uses; and (2) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture,

use, or sale of the drug."  21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(j)(7)(A)(iii).

35.    In 1984, Congress amended the FDC Act with the enactment of the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), commonly referred to as the "Hatch-Waxman Act."

36.    The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval.  The Act provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA").

37.    The ANDA relies on the scientific findings of safety and efficacy included by the brand-name drug manufacturer in the original NDA.  The ANDA filer, however, must scientifically demonstrate to the FDA that the generic drug it is going to market is just as safe and just as effective as the corresponding brand-name drug through demonstrations of bioequivalence.  A demonstration of bioequivalence means that, within certain set parameters of variability, the generic product delivers the same amount of active ingredient into the patient's blood stream for the same amount of time as the corresponding brand drug.  The range of acceptable variability afforded to generic drugs for demonstrating bioequivalence is the same lot-to-lot (i.e., batch-to-batch) range of variability afforded to brand companies when manufacturing their own brand drug.

38.    Generally speaking, ANDA filers that demonstrate bioequivalence seek to have their generic products deemed to be "AB-rated" to the corresponding brand-name drug, sometimes referred to as the "reference listed drug." AB-rated generics are those that have been determined by the FDA to be therapeutically equivalent (i.e., bioequivalent) and pharmaceutically equivalent to their brand-name counterparts.  Pharmaceutical equivalence

means the generic drug and branded reference listed drug have, among other things, the same active ingredient, same strength, same route of administration, and same dosage form. Generic drugs that do not fulfill all of these requirements cannot be deemed to be AB-rated to the targeted reference listed drug.

39.     FDA approval of an ANDA requires a generic manufacturer's ANDA to contain one of the following four certifications: (a) the brand-name drug has no patent associated with it (a "Paragraph I certification"); (b) the brand-name drug's patents have expired (a "Paragraph II certification"); (c) the brand-name drug's patents will expire before the generic enters the market (a "Paragraph III certification"); or (d) the patent for the brand-name drug is invalid or will not be infringed by the generic product (a "Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii).

40.     If a generic manufacturer files a Paragraph IV certification that the listed patent is invalid or will not be infringed, it must promptly give notice to both the NDA owner and the owner of the patent(s) at issue. The filing of an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement. 35 U.S.C. § 271(e)(2)(A). If the patent owner initiates an infringement action against the ANDA filer within 45 days, then the FDA may not finally approve the ANDA until the earlier of either 30 months or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii). If, however, the patent owner fails to initiate a patent infringement action within 45 days after receiving notice of the generic manufacturer's Paragraph IV certification, then the FDA may grant final approval to the generic manufacturer's ANDA upon satisfying itself as to the safety and efficacy of the generic product. Accordingly, the timely filing of an infringement action provides the patent owner with the equivalent of a 30-month automatic

preliminary injunction.  Prompt disposition of such an action, as through a motion for summary judgment, may mean more rapid approval for a generic manufacturer subject to such a stay.

41.     To encourage generic manufacturers to challenge branded drug patents and/or to design around them, the Hatch-Waxman Act grants the first Paragraph IV ANDA filer a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand-name drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).

42.     Typically, AB-rated generic versions of brand-name drugs are priced significantly below the brand-name counterparts.  Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions are rapidly and substantially substituted for their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of a drug predictably decrease significantly because of competition among the generic manufacturers, and because the loss of sales volume by the brand-name drug to the corresponding generics is dramatic.

43.     An AB rating is particularly significant to a generic manufacturer because, under the statutory regime enacted by Congress (i.e., the Hatch-Waxman Act) and most state legislatures (i.e., Drug Product Selection laws, or "DPS laws"), pharmacists may (and, in most states, must) substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission from the prescribing doctor.  Indeed, both Congress and state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (a) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers; and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

44.     Generic competition enables end-payors to: (a) purchase generic versions of brand-name drugs at substantially lower prices; and/or (b) purchase the brand-name drug at reduced prices.   However, until generic manufacturers enter the market with an AB-rated generic, there is no bioequivalent generic drug that competes with the brand-name drug and, therefore, the brand-name manufacturer can continue to charge supra-competitive prices profitably without losing all or a substantial portion of its brand-name sales.   Consequently, brand-name drug manufacturers have a strong incentive to use various anticompetitive schemes, including the tactics alleged herein, to delay the introduction of AB-rated generic competition into the market.

**B.     AB-rated Generic Versions of Brand-Name Drugs Are Significantly Less Expensive, and Take Significant Sales Directly from the Corresponding Brand-Name Versions**

45.     Competition from lower-priced AB-rated generic drugs saves American consumers $8 to $10 billion a year.   As set forth *infra*, however, these consumer savings mean lower profits for brand drug companies.   It is well-established that when AB-rated generic entry occurs, the brand drug company suffers a rapid and steep decline in sales and profits on its reference listed drug.

46.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).

47.     The threat of AB-rated generic competition thus creates a powerful incentive for brand companies to protect their revenue streams.   This incentive can prompt brand companies to create innovative new products or new versions of old products that offer no real medical benefits to patients.   It may also drive brand companies to seek to obstruct generic drug

competition by engineering illegal anticompetitive schemes to delay or prevent lower cost generic equivalents from entering the market, including entering into illegal agreements, as here, intended to interfere with the normal brand-to-generic competition contemplated and encouraged by the Hatch-Waxman Act and various state laws.

48.      Such tactics can be an effective, albeit anticompetitive, way to "game the regulatory structure" that governs the approval and sale of generic drugs, thereby frustrating the intention of federal and state law designed to promote and facilitate price competition in pharmaceutical markets.

## VI.      FACTUAL ALLEGATIONS

### A.      Boehringer Brings Aggrenox to Market

49.      Boehringer received FDA approval of its NDA No. 20-884 in 1999 for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules.  These capsules were described by Boehringer in NDA No. 20-884 to reduce the risk of stroke in patients who have already suffered a "mini-stroke" (or transient ischemic attack) or a completed ischemic stroke due to thrombosis.

50.      On January 18, 2000, the United States Patent and Trade Office issued the '577 patent.  The '577 patent's title is "Pharmaceutical Compositions Containing Dipyridamole or Mopidamol and Acetylsalicylic Acid of the Physiologically Acceptable Salts Thereof, Processes for Preparing Them and Their Use in Treating Clot Formation."  The '577 patent is owned by Boehringer (directly or through affiliates BII and BIPI).  After receiving FDA approval for NDA No. 20-884, Boehringer listed the '577 patent in the "Orange Book" for Aggrenox.

### B.      Barr Files an ANDA for Aggrenox/Boehringer Claims Infringement

51.      Barr filed ANDA No. 78-804 with the FDA to market a generic 200 mg

extended-release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules in May 2007.  As statutorily required, Barr sent Boehringer a notice letter that it had filed its ANDA on or about May 31, 2007.  The notice letter contained a Paragraph IV certification that Barr's generic version of Aggrenox would not infringe the '577 patent.  Barr was the first-filer of an ANDA for a generic bioequivalent of Aggrenox. As such, it was entitled to market its generic Aggrenox for 180 days free of competition from other generic Aggrenox products (this exclusivity does not include an authorized generic version of Aggrenox sold by Boehringer or a licensee of Boehringer).

52.     Following Barr's filing of its ANDA for generic Aggrenox, Boehringer reflexively filed a '577 patent infringement suit against Barr on July 11, 2007 in the United States District Court for the District of Delaware.  The suit put in place the statutory 30-month stay prohibiting the FDA from granting Barr final approval to introduce generic Aggrenox until November 30, 2009 or until a final judgment concerning the validity or infringement of the '577 patent — whichever occurred earlier.  Barr counterclaimed, seeking declaratory judgments that: (1) the '577 patent was invalid; (2) Barr's proposed generic product did not infringe the '577 patent; and (3) the '577 patent was unenforceable for inequitable conduct.  Barr's defenses and counterclaims were strong and, absent a settlement, Barr would likely have prevailed in the litigation.

53.     Barr's successful challenge to the '577 patent would have enabled Barr to introduce its lower-priced generic Aggrenox product in competition with Boehringer's branded product.  It also would have allowed other generic manufacturers to enter the market — further lowering the price of generic Aggrenox.

54.     Recognizing the serious threat of its '577 patent being invalidated, Boehringer formulated an anticompetitive scheme to split monopoly profits with Barr in exchange for Barr

foregoing its ANDA application and agreeing not to sell its generic version of Aggrenox for a period of seven (7) years.

55.     The scheme took flight on August 11, 2008 when Boehringer entered into the Reverse Payment Agreement with Barr to resolve the '577 patent litigation.  Pursuant to the settlement, Barr agreed to abandon its challenge to the '577 patent and not market its generic version of Aggrenox before July 1, 2015.  The '577 patent was set to expire in January 2017.  Thus, the Reverse Payment Agreement maintained approximately 82% of the '577 patent's life.

56.     In return, Boehringer entered into a "co-promotion deal" with Barr, whereby Barr's subsidiary, Duramed, would promote Aggrenox to obstetricians and gynecologists during this seven-year period.  Under the "co-promotion deal," Barr would receive approximately $120 million over seven years (based on Aggrenox's 2008 sales levels).  The deal's structure included an immediate payment and continuing payments each year calculated as a percentage of Aggrenox United States sales.

57.     Thus, in exchange for Barr's agreement to drop its challenge to Boehringer's patent and not launch its lower-priced generic product for the next seven years, Boehringer agreed to share with Barr the monopoly profits that Boehringer would reap from Aggrenox's extended market.

**C.      FTC Investigates Boehringer-Barr Reverse Payment Settlement Agreement**

58.     On January 15, 2009, the FTC opened a formal investigation of the Boehringer and Barr Reverse Payment Agreement relating to Aggrenox to determine whether the settlement illegally sought to delay the marketing of Barr's lower-cost generic substitute for Aggrenox.  The FTC subsequently issued a subpoena to Boehringer on February 5, 2009 in this investigation.  The subpoena contained robust document requests relating to all aspects of the

Aggrenox Reverse Payment Agreement between Boehringer and Barr in an effort to unveil the true nature of the co-promotion payments to Barr, including documents concerning: (a) the patent litigation over Aggrenox; (b) the Boehringer-Barr Reverse Payment Agreement; (c) financial analyses, such as the effects of generic entry; and (d) financials, marketing, and other materials concerning Aggrenox.

59.    Boehringer resisted producing documents responsive to the FTC's subpoena concerning the "co-promotion deal."

60.    Consequently, in October 2009 the FTC filed a petition in the U.S. District Court for the District of Columbia, accusing Boehringer of failing substantially to comply with its subpoena by using several stall tactics, including inappropriately redacting documents, failing to conduct a careful and thorough search, and improperly claiming privilege.

61.    The "co-promotion deal" involved Barr promoting Aggrenox, a preventative stroke medication, to women's health professionals (obstetricians and gynecologists) — not the target medical community for this type of prescription drug.  The utility of the "co-promotion deal" to Boehringer, on its face, is highly suspect.

62.    Simply put, the payments flowing from the "co-promotion deal" from Boehringer to Barr did not reflect fair value in relation to the benefits conferred (i.e., an increase in sales of Aggrenox).  In a June 2013 court filing, the FTC stated:

> The terms of the co-promotion agreement reveal that it was a significant financial transaction. . . .  Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on total U.S. Aggrenox sales for a period of years. . . . In 2008, Aggrenox had total U.S. sales of about $366 million. . . . At this level of sales, the FTC estimates that the deal would ultimately cost Boehringer over $120 million in royalties.

*See* Brief of Appellant Federal Trade Commission (Document #1444255) at 36, Case No. 12-

5393 (D.C. Cir.) (emphasis added).

63. Boehringer itself has clearly expressed it would not have given Barr the "co-promotion deal" but for Barr agreeing to delay entering the market with its generic Aggrenox product. "It [the co-promotion deal] was part of the flow of compensation. It [the co-promotion deal] was part of the considerations of the settlement . . . ." *Id.* at 37 (emphasis added).

64. Further, Magistrate Judge Facciola held: "After reviewing [a motion to compel], the status reports and oppositions, and affidavits accompanying the in camera submissions, I agree that the co-promotion agreement was an integral part of the litigation." *See* 9/27/2012 Memorandum Opinion, Doc. No. 69, at p. 10 (emphasis added).

65. On December 23, 2008, Barr became a wholly-owned subsidiary of Teva. Teva continued to perform under the terms of the Reverse Payment Agreement between Barr and Boehringer. On August 14, 2009, Teva received final FDA approval of ANDA No. 78-804 to enter the market; yet, Teva continued to refrain from entering the market with a generic equivalent of Aggrenox. Boehringer continued to make payments to Teva and has not launched its own less expensive authorized generic pursuant to the Reverse Payment Agreement.

## VII.    ANTICOMPETITIVE EFFECT

66. The Reverse Payment Agreements have enabled Defendants to: (a) prevent or delay the entry of less expensive generic versions of Aggrenox products in the United States; (b) fix, raise, maintain, or stabilize the price of Aggrenox products; and (c) allocate 100% of the U.S. market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules to Boehringer.

67. Barr's ANDA was finally approved by FDA on August 14, 2009. "But for" the continuing illegal agreements between Barr and Boehringer (which included financial

inducements to delay the launch of less expensive generic versions of Aggrenox), Barr would have begun selling a less expensive AB-rated generic version of Aggrenox on or after August 14, 2009, but prior to the filing of this Complaint.  Such sales would have occurred by way of market entry by Barr through: (a) an agreement between Boehringer and Barr that did not include illegal financial inducements to delay generic entry and thus would allow for earlier market entry; (b) a victory by Barr in the patent litigation; or (c) a launch "at risk" by Barr upon termination of the 30-month stay, but before termination of the patent litigation.  In addition, upon market entry by Barr, Boehringer would have begun selling its own less expensive authorized generic version of Aggrenox in direct competition either directly or through a licensee.  Other ANDA-based generic versions of Aggrenox would have followed into the market approximately 180 days after the launch by Barr.

68.     Defendants' unlawful concerted action has delayed or prevented the sale of generic Aggrenox in the United States, and unlawfully enabled Boehringer to sell Aggrenox at artificially inflated, supra-competitive prices.  "But for" Defendants' illegal, ongoing conduct, generic competition to Aggrenox would have occurred already because one or more of the generic companies would have already entered with its generic version of Aggrenox, and/or a Boehringer licensee would have launched an authorized generic product contemporaneously with the first generic launch.

### VIII.   EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

69.     At all material times, Boehringer manufactured, marketed, promoted, distributed, and sold substantial amounts of Aggrenox in a continuous and uninterrupted flow of commerce across state lines and throughout the United States and abroad.

70.     At all material times, Defendants transmitted funds, as well as contracts,  invoices and other forms of business communications and transactions, in a continuous and uninterrupted

flow of commerce across state and national lines in connection with the sale of Aggrenox and/or AB-rated bioequivalents.

71.     In furtherance of their efforts to monopolize and restrain competition in the market for Aggrenox and its generic equivalents, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.  Defendants' activities were within the flow of and have substantially affected interstate commerce.

72.     Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, retailers within each state are foreclosed from offering less expensive generic Aggrenox to end-payors inside each respective state.  The foreclosure of generic Aggrenox directly impacts and disrupts commerce for end-payors within each state by forcing them to buy the branded product at the higher price.

### IX.     MARKET POWER AND MARKET DEFINITION

73.     At all relevant times, Boehringer had substantial market power (i.e., monopoly power) with respect to 200 mg extended- release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules because it had the power to maintain the price of the drug it sold as Aggrenox at supra-competitive levels without losing so many sales as to make the supracompetitive price unprofitable.

74.     A small, but significant, non-transitory price increase above the competitive level for Aggrenox by Boehringer would not have caused a loss of sales sufficient to make the price increase unprofitable.

75.     At competitive price levels, Aggrenox does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions

of Aggrenox.

76.     The differing efficacy, safety, and side effect profiles of different treatments play a critical role in doctors' selection of the most appropriate treatment for a particular patient. There are no interchangeable drug products that are available to prescribing physicians for the indications for which extended-release 200 mg dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules is prescribed.   The FDA does not consider such products to be bioequivalent or substitutes.

77.     Boehringer needed to control only Aggrenox and its AB-rated generic equivalents, and no other products, in order to maintain the price of Aggrenox profitably at supracompetitive prices.   Only the market entry of a competing, AB-rated generic version of Aggrenox would render Boehringer unable to profitably maintain substantially supracompetitive prices for Aggrenox.

78.     Defendants had, and exercised, the power to exclude and restrict competition to Aggrenox and AB-rated bioequivalents.

79.     Boehringer, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market as a result of patent and other regulatory protections and high costs of entry and expansion.

80.     To the extent that Plaintiff is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, Plaintiff alleges that the relevant market is the molecule — 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules (i.e., Aggrenox and its AB-rated generic equivalents).   During the period relevant to this case, Boehringer has been able to profitably maintain the price of 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid (aspirin) capsules well above

competitive levels.

81.     The relevant geographic market is the United States and its territories.  At all relevant times, Boehringer's market share in the relevant market was and remains 100%.

## X.     ANTITRUST IMPACT

82.     During the relevant period, Plaintiff and/or members of the Class purchased substantial amounts of branded Aggrenox indirectly from Boehringer.  As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for Aggrenox.  Those prices were substantially greater than those that members of the Class would have paid absent the illegal conduct alleged herein.

83.     As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

84.     General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for Aggrenox results in higher prices at every level below.   Herbert Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE p. 624 (1994).  Professor Herbert Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."  He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

85.     Defendants' anticompetitive conduct enabled them to charge consumers indirectly and third-party payors prices in excess of what Defendants otherwise would have been able to charge absent Defendants' anticompetitive conduct.

86.     The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

87.     The inflated prices the Class paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

## XI.     CLAIMS FOR RELIEF

### COUNT ONE: (DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT) (Against All Defendants)

88.     Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

89.     Plaintiff's allegations described herein constitute violations of §§ 1 and 2 of the Sherman Act, as well as state antitrust and consumer protection laws.

90.     Boehringer effectuated this scheme beginning in August 2008 when it entered into a Reverse Payment Agreement with Barr.   Pursuant to the settlement, Barr agreed to abandon its challenge to Boehringer's '577 patent and not market its generic version of Aggrenox before July 1, 2015 (i.e., for seven years).

91.     There is and was no legitimate, non-pretextual, procompetitive business justification for the Reverse Payment Agreement that outweighs its harmful effect.   Even if there were some conceivable justification, the payments were not necessary to achieve such a purpose.

92.     As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

93.     By engaging in the foregoing conduct, Defendants have violated §§ 1 and 2 of the Sherman Act and comparable state antitrust and consumer protection laws.

94.     Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

95.     The goal, purpose and/or effect of the Reverse Payment Agreement was to prevent and/or delay generic competition of Aggrenox and enable Boehringer to continue charging supracompetitive prices for Aggrenox without a substantial loss of sales.  Such actions allowed Defendants to share the supracompetitive profits that their unlawful agreement made possible.

96.     Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count.  Their injury consists of paying higher prices for Aggrenox than they would have paid in the absence of those violations. These injuries will continue unless halted.

97.     Each Defendant committed at least one overt act in furtherance of the conspiracy.

98.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class were harmed.

99.     Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of §§ 1 and 2 of the Sherman Act.

100.     Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## COUNT TWO: CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (Against all Defendants)

101.     Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

102.  By engaging in the anticompetitive conduct alleged herein, Defendants have intentionally and unlawfully engaged in one or more combinations and/or conspiracies in restraint of trade in violation of the following state laws:

a.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of Aggrenox in Arizona by members of the Class.

b.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of Aggrenox in California by members of the Class.

c.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-4503, *et seq.*, with respect to purchases of Aggrenox in the District of Columbia by members of the Class.

d.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Aggrenox in Florida by members of the Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Hawaii Code §§ 480, *et seq.*, with respect to purchases of Aggrenox in Hawaii by members of the Class.

f.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Iowa Code §§ 553, *et seq.*, with respect to purchases of Aggrenox in Iowa by members of the Class.

g.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Aggrenox in Kansas by members of the Class.

h.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to purchases of Aggrenox in Maine by members of the Class.

i.      Defendant have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.*, with respect to purchases of Aggrenox in Massachusetts by members of the Class.

j.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of Aggrenox in Michigan by members of the Class.

k.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of Aggrenox in Minnesota by members of the Class.

l.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of Aggrenox in Mississippi by members of the Class.

m.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*, with respect to purchases of Aggrenox in Nebraska by members of the Class.

n.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases of Aggrenox in Nevada by members of the Class, in that thousands of sales of Aggrenox took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

o.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Aggrenox in New Mexico by members of the Class.

p.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Aggrenox in New York by members of the Class.

q.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Aggrenox in North Carolina by members of the Class.

r.      Defendants have intentionally and unlawfully engaged in a combination

and conspiracy in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases of Aggrenox in North Dakota by members of the Class.

s.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Aggrenox in Puerto Rico by members of the Class.

t.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Aggrenox in Rhode Island by members of the Class.

u.    Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases of Aggrenox in South Dakota by members of the Class.

v.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Aggrenox in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Aggrenox at Tennessee pharmacies.

w.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases of Aggrenox in Utah by members of the Class.

x.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Aggrenox in Vermont by members of the Class.

y.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of Aggrenox in West Virginia by members of the Class.

z.    Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases of Aggrenox in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Aggrenox at Wisconsin pharmacies.

## COUNT THREE: CONSPIRACY TO MONOPOLIZE UNDER STATE LAW
### (Against all Defendants)

103.    Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

104.    At all relevant times, Boehringer possessed monopoly power in the relevant market.

105.    Boehringer entered into an illegal agreement (reverse payment settlement agreement) with Barr, as part of an overall scheme, to settle a patent infringement suit in order to maintain its monopoly power in the market for Aggrenox as described herein.

106.    The goal, purpose and effect of the illegal agreement were for Boehringer to maintain and extend its monopoly power in the Aggrenox market.

107.    Plaintiff and members of the Class indirectly purchased substantial amounts of Aggrenox from Boehringer.

108.    With timely competitive market entry by manufacturers of generic Aggrenox, Plaintiff and members of the Class would have substituted lower-priced generic Aggrenox for the higher priced branded version for some or all of their Aggrenox requirements, and/or would have paid lower net prices on their remaining purchases.

109.    Defendants each committed at least one overt act in furtherance of the conspiracy.

110.    As a result of Defendants' illegal concerted conduct, Plaintiff and members of the Class were forced to pay, and did pay, more than they would have paid for Aggrenox or a generic equivalent.

111.    By engaging in the foregoing misconduct, Boehringer has violated the following state antitrust laws:

a.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq*., with respect to purchases of Aggrenox in Arizona by members of the Class.

b.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq*., with respect to purchases of Aggrenox in California by members of the Class.

c.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Aggrenox in the District of Columbia by members of the Class.

d.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Aggrenox in Florida by members of the Class.

e.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Haw. Rev. Stat. §§ 480, *et seq*., with respect to purchases of Aggrenox in Hawaii by members of the Class.

f.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Iowa Code §§ 553, *et seq*., with respect to purchases of Aggrenox in Iowa by members of the Class.

g.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases of Aggrenox in Kansas by members of the Class.

h.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1102, *et seq*., with respect to purchases of Aggrenox in Maine by members of the Class.

i.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq*., with respect to purchases of Aggrenox in Massachusetts by members of the Class.

j.      Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq*., with respect to purchases of Aggrenox in Michigan by members of the Class.

k.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Aggrenox in Minnesota by members of the Class.

1.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Aggrenox in Mississippi by members of the Class.

m.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Neb. Rev. Stat. Ann. §§ 59-802, *et seq.*, with respect to purchases of Aggrenox in Nebraska by members of the Class.

n.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Aggrenox in Nevada by members of the Class.

o.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356, 356:2, 356:3, *et seq.*, with respect to purchases of Aggrenox in New Hampshire by members of the Class.

p.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Aggrenox in New Mexico by members of the Class.

q.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Aggrenox in New York by members of the Class.

r.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Aggrenox in North Carolina by members of the Class.

s.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Aggrenox in North Dakota by members of the Class.

t.     Defendants have intentionally and unlawfully engaged in a conspiracy to

monopolize the relevant market in violation of R.I. Gen. Laws §§ 6-36-1, *et seq*., with respect to purchases of Aggrenox in Rhode Island by members of the Class.

u.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq*., with respect to purchases of Aggrenox in South Dakota by members of the Class.

v.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases of Aggrenox in Tennessee by members of the Class.

w.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Utah Code Ann. §§ 76-10-1301, *et seq*., with respect to purchases of Aggrenox in Utah by members of the Class.

x.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*., with respect to purchases of Aggrenox in Vermont by members of the Class.

y.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of W. Va. Code §§ 47-18-3, *et seq*., with respect to purchases of Aggrenox in West Virginia by members of the Class.

z.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Wis. Stat. §§ 133.03, *et seq*., with respect to purchases of Aggrenox in Wisconsin by members of the Class.

## COUNT FOUR: MONOPOLIZATION UNDER STATE LAW
## (Against All Boehringer Defendants)

112.  Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

113.  At all relevant times, Boehringer possessed monopoly power in the relevant market.

114.  Boehringer entered into an illegal agreement (Reverse Payment Agreement) with

32

Barr, as part of an overall scheme, to settle a patent infringement suit in order to maintain its monopoly power in the market for Aggrenox as described herein.

115.    The goal, purpose and effect of the illegal agreement was for Boehringer to maintain and extend its monopoly power in the Aggrenox market.

116.    Plaintiff and members of the Class indirectly purchased substantial amounts of Aggrenox from Boehringer.

117.    As a result of Defendants' illegal conduct, Plaintiff and members of the Class were forced to pay, and did pay, more than they would have paid for Aggrenox.

118.    Had manufacturers of generic Aggrenox entered the market and lawfully competed in a timely fashion, Plaintiff and members of the Class would have substituted lower-priced generic Aggrenox for the higher priced branded version for some or all of their Aggrenox requirements, and/or would have paid lower net prices on their remaining Aggrenox purchases.

119.    By engaging in the foregoing misconduct, Boehringer has violated the following state antitrust laws:

    a.    Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Aggrenox in Arizona by members of the Class.

    b.    Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of Aggrenox in California by members of the Class.

    c.    Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Aggrenox in the District of Columbia by members of the Class.

    d.    Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Aggrenox in Florida by members of the Class.

e.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Haw. Rev. Stat. §§ 480, *et seq.*, with respect to purchases of Aggrenox in Hawaii by members of the Class.

f.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Iowa Code §§ 553, *et seq.*, with respect to purchases of Aggrenox in Iowa by members of the Class.

g.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Aggrenox in Kansas by members of the Class.

h.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. tit.10, §§ 1102, *et seq.*, with respect to purchases of Aggrenox in Maine by members of the Class.

i.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Aggrenox in Massachusetts by members of the Class.

j.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Aggrenox in Michigan by members of the Class.

k.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Aggrenox in Minnesota by members of the Class.

l.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Aggrenox in Mississippi by members of the Class.

m.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Mo. Rev. Stat. §§ 416.011, *et seq.*, with respect to purchases of Aggrenox in Missouri by members of the Class.

n.      Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Neb. Rev. Stat. Ann. §§ 59-802, *et seq.*, with respect to purchases of Aggrenox in Nebraska by

members of the Class.

o.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Aggrenox in Nevada by members of the Class.

p.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356, 356:2, 356:3, *et seq.*, with respect to purchases of Aggrenox in New Hampshire by members of the Class.

q.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Aggrenox in New Mexico by members of the Class.

r.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Aggrenox in New York by members of the Class.

s.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Aggrenox in North Carolina by members of the Class.

t.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Aggrenox in North Dakota by members of the Class.

u.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Aggrenox in Rhode Island by members of the Purchaser Class.

v.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq.*, with respect to purchases of Aggrenox in South Dakota by members of the Class.

w.       Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Aggrenox in Tennessee by members of the Class.

x.     Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-1301, *et seq*., with respect to purchases of Aggrenox in Utah by members of the Class.

y.     Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Aggrenox in Vermont by members of the Class.

z.     Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-3, *et seq*., with respect to purchases of Aggrenox in West Virginia by members of the Class.

aa.    Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Wis. Stat. §§ 133.03, *et seq*., with respect to purchases of Aggrenox in Wisconsin by members of the Class.

bb.    Boehringer has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of the Puerto Rico Antitrust Act 10 L.P.R.A. 263, *et seq*., with respect to purchases of Aggrenox in Puerto Rico by members of the Class.

120.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged herein.  Their injury consists of paying higher prices for Aggrenox than they would have paid in the absence of such violations.  This injury is of the type the antitrust and consumer protection laws of the above States, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendant's conduct unlawful.

## COUNT FIVE: CONSUMER PROTECTION AND UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW
### (Against all Defendants)

121.    Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

122.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive

acts or practices in violation of the state consumer protection statutes listed below.

123.   There was a gross disparity between the price that Plaintiff and the Class members paid for the brand product and the value received, given that a less expensive substitute generic product should have been available.

124.   As a direct and proximate result of Defendants' unfair competition or unfair, unconscionable, deceptive acts or practices in violation of the state consumer protection statutes listed below, Plaintiff and Class members were deprived of the opportunity to purchase a generic version of Aggrenox and forced to pay higher prices.

125.   By engaging in the foregoing conduct, Defendants have violated the following state unfair and deceptive trade practices and consumer fraud laws:

      a.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522, *et seq.*

      b.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

      c.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq.*

      d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*

      e.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §§ 480, *et seq.*

      f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code §§ 714.16, *et seq.*

      g.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq.*

      h.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*

      i.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. Ann. §§ 50-623, *et seq.*

j.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of  Me. Rev. Stat. tit. 5 §§ 207, *et seq.*

k.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, *et seq.*

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

m.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 8.31, *et seq.*

n.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

o.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq.*

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.*

q.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq.*

r.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.*

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq.*

u.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq.*

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq.*

w.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

x.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

y.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq.*

z.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code §§ 46A-6-101, *et seq.*

126.    Plaintiff and the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable or deceptive acts alleged herein.  Their injury consists of paying higher prices for Aggrenox than they would have paid in the absence of such violations.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## COUNT SIX: UNJUST ENRICHMENT
### (Against All Defendants)

127.    Plaintiff repeats and realleges all preceding paragraphs in this Complaint herein.

128.    Defendants have benefited from the monopoly profits on the sale of Aggrenox resulting from the unlawful and inequitable acts alleged in this Complaint.

129.    Defendants' financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Aggrenox by Plaintiff and members of the Class.

130.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

131.    It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract.

132.    It would be futile for Plaintiff and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it indirectly

purchased Aggrenox, as they are not liable and would not compensate Plaintiff for unlawful conduct caused by Defendants.

133.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Aggrenox is a direct and proximate result of Defendants' unlawful practices.

134.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

135.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states, except for Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for Aggrenox derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this complaint.

136.    Defendants are aware of and appreciated the benefits bestowed upon them by Plaintiff and the Class.

137.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds they received.

138.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

139.    Plaintiff and the Class have no adequate remedy at law.

## XII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays that:

A.     The Court determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, and declare the Plaintiff as the representative of the Class;

B.     The acts alleged herein be adjudged and decreed to be in violation of state antitrust, consumer protection, and unjust enrichment laws as alleged herein;

C.     Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class.

D.     Permanently enjoin Defendants pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, from continuing their unlawful conduct, so as to ensure that similar anticompetitive conduct does not continue to occur in the future;

E.     Award the Class damages (i.e., three times overcharges) in an amount to be determined at trial;

F.     Award Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a construction trust to remedy Defendants' unjust enrichment;

G.     Award Plaintiff and the Class damages as permitted by law, including disgorgement;

H.     Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

I.     Such other and further relief as the Court may deem just and proper.

### XIII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims and complaints in this Complaint so triable.


Dated: November 18, 2013

THE PLAINTIFF,
A.F. of L. – A.G.C. BUILDINGS TRADE WELFARE PLAN

BY MOTLEY RICE LLC
ITS ATTORNEYS


By  */s/ Ingrid L. Moll*
Ingrid L. Moll (CT 21866)
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1678
Facsimile: (860) 882-1682
imoll@motleyrice.com

Michael M. Buchman (CT 16399)
John A. Ioannou (*pro hac vice* application
    forthcoming)
MOTLEY RICE LLC
600 Third Ave, Suite 2101
New York, NY 10016
Telephone: (212) 577-0051
Facsimile: (212) 577-0054
mbuchman@motleyrice.com
jioannou@motleyrice.com